IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOROTHY FEASTER, | : | Civil Action – Law |
| | : | |
| Plaintiff | : | Case No.  4:CV-05-0193 |
| | : | |
| vs. | : | Judge:  MUIR |
| | : | |
| UNION COUNTY PENNSYLVANIA, | : | Complaint Filed:  01/28/05 |
| | : | |
| Defendant | : | JURY TRIAL DEMANDED |
| | : | ELECTRONICALLY FILED |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I.  INTRODUCTION

   In it's Memorandum of Law, Defendant raises only two issues for consideration:  whether Plaintiff has shown sufficiently pervasive or severe conduct for a sexual harassment claim; and whether respondeat superior liability exists given the existence of a sexual harassment reporting policy and the actions taken by Defendant in response to Plaintiff's reports of her direct superior's sexual harassment.

II. COUNTERSTATEMENT OF FACTS

The following facts are taken from Defendant's Statement of Material Undisputed Facts and Plaintiff's Response thereto.

Plaintiff was hired by Defendant as a custodial worker, beginning her employment on March 18, 1998.  During the time in question, she worked 3 p.m. to 11 p.m.  Her direct superior was Custodial Supervisor David Hughes.  Hughes is the person who sexually harassed Plaintiff.

Hughes began harassing Plaintiff with months of her hiring.  Plaintiff testified that Hughes would say inappropriate things to her once or twice a week, and talked "filthy stuff all the time."  Approximately twice a month, Hughes would stroke her palm with his fingers in a sexually suggestive.  Several times he pretended that he wanted to whisper something to her and then blew in her ear.  He told Plaintiff that he would like to see where her bikini lines were, that he had seen her laying out in her yard, that he liked to watch his wife have her physical performed by her doctor, that he saw Plaintiff and her husband in their truck and Plaintiff's blond head was bobbing up and down as if she were performing oral sex, that he had pictures of her in her bathing suit, and that she shouldn't hang her coat up over his because the smell of her perfume aroused him.  Approximately twice a week he put his arm around Plaintiff's shoulders.  He grabbed his private parts on more than one occasion. On or about October 29, 2002, he stated that his wife had said that if he got home by 3:15 she would give him "a piece of ass."  He then grabbed his private parts and stated, "I have half a hard on now so I better go."  Plaintiff had

told Hughes to stop these things, that she did not like it, and that she was a happily married woman, but he did not stop.

Prior to October 29, 2002, Plaintiff discussed Hughes' conduct with certain co-employees. Plaintiff testified that she had not previously told Defendant's Chief Clerk Nace or the Commissioners because Hughes had, quite a few times, stated to Feaster and others not to go over his head to the Commissioners about anything and, "if you do you'll be on the outside looking in," and she was therefore afraid. Plaintiff was "scared to [report Hughes' conduct] because it's going to get back to [Hughes] that I told on him…[a]nd if it gets back to him I'll lose my job."

Plaintiff testified that on October 29, 2002, she told Nace and Commissioner Brouse "what [Hughes] was doing to me," that she "couldn't take it anymore," and that Hughes had said not to come to the Commissioners about anything. Plaintiff then provided Defendant with a written statement discussing Hughes inappropriate comments, Hughes' comment about not going over his head, Hughes' grabbing his private parts, and Hughes' putting his arm around Plaintiff when he told her not to put her coat over his.

Defendant suspended Hughes pending investigation into Plaintiff's report.

On November 6, 2002, Plaintiff attended a meeting with Nace, the Commissioners, and Defendant's Solicitor, Andrew Lyons, Esquire. When Plaintiff first came into the meeting, Lyons asked her what was happening with Hughes and her. Plaintiff told them that Hughes was making sexual comments and

3

sexual acts toward her and touching her. She told them Hughes was putting his arm around her, blowing in her ear, and stroking her palm. Lyons then asked if Plaintiff had told Hughes to stop, and Plaintiff responded that she had, and that she had told Hughes that she didn't like it, to stop, and that she was a happily married woman. Lyons then asked how many times Hughes would do these things, and Plaintiff told him, and that she could not work with Hughes anymore. Lyons responded that Hughes was her supervisor and she "ha[d] to" work with him. When Plaintiff responded that she was scared to death of Hughes, and to be at work at night with him, and that there would be times when she might be alone when Hughes came in, Lyons reiterated that Plaintiff was going to have to continue working with Hughes. Plaintiff then asked if she could have a different supervisor, and Lyons stated, "No, you will work for Dave Hughes." At that point, Plaintiff walked toward the door, started to hyperventilate, and collapsed. An ambulance was called and she was taken to the hospital emergency room.

After Plaintiff's collapse, Defendant decided to request Hughes' resignation, which was tendered on November 7, 2002. Plaintiff never again worked with Hughes.

Plaintiff claims Defendant had prior knowledge of sexual harassment by Hughes. Plaintiff testified that Candy Ranck, whom Plaintiff had replaced as a custodial worker, told Plaintiff that Hughes did things to her too, that she told Ruth Zimmerman, who was a Commissioner at the time, that nothing was done about it,

and that was why she quit. Plaintiff also testified that co-worker Craig Ritter, who left in 1998, had reported sexual comments by Hughes.   Chief Clerk Nace signed a statement that she had received a letter of November 1, 2002, from District Attorney Johnson informing her that Hughes had a prior rape conviction. Commissioner Brouse signed a statement that, although he did not have "first hand knowledge," he had heard rumors regarding Hughes' past criminal record. Commissioner Bossert signed a statement that he "had heard rumors that something was going on between Dorothy Feaster and David Hughes prior to October 31, 2002," although he did not know specific facts.

   Plaintiff is attempting to obtain Affidavits or depositions of certain witnesses with relevant information about Defendant's knowledge, and seeks leave to supplement the Exhibits to this Brief with those Affidavits or depositions. Currently pending before this Court is an Under Seal Motion by Plaintiff to extend discovery and other dates.  Specifically, Plaintiff's counsel has been told by Defendant's Chief Probation Officer that he had preformed the criminal background check required for Hughes' hiring, that it disclosed one or two prior felony rape convictions, and that he had informed the Chief County Clerk at that time, Diana Robinson, about the convictions.  Former employee Candy Ranck told Plaintiff's counsel that she reported sexual harassment by Hughes to former Commissioner Ruth Zimmerman. Former employee Craig Ritter told Plaintiff's counsel that he had informed Commissioner Brouse that Hughes had been in

5

prison, that no one should go through sexual harassment, and that Hughes should not be working around women.

Defendant did have a sexual harassment policy as discussed in Defendant's Statement of Undisputed Material Facts and Brief, and Plaintiff knew of the same. Plaintiff had filed an earlier sexual harassment complaint with Defendant about a jail employee; however, she did not have to work with that employee as she had with Hughes.

III. ARGUMENT

As noted above, currently pending before this Court is an Under Seal Motion by Plaintiff to extend discovery and other dates.  Plaintiff is attempting to obtain Affidavits or depositions of certain witnesses with relevant information described above, and seeks leave to supplement the Exhibits to this Brief with those Affidavits or depositions.

Defendant has raised only two issues: whether Plaintiff has shown sufficiently pervasive or severe conduct for a sexual harassment claim; and whether respondeat superior liability exists given the existence of a sexual harassment reporting policy and the actions taken by Defendant in response to Plaintiff's reports of her direct superior's sexual harassment.

### A. Pervasiveness/severity

Hughes began harassing Plaintiff within months of her hiring.  In alleging that Hughes' conduct was not sufficiently pervasive or severe, Defendant has misstated

the frequency of Hughes' conduct, and ignored other conduct, citing only that Hughes had made comments and occasionally stroked Plaintiff's palm or blew in her ear. Even though Plaintiff told Hughes to stop, that she did not like his conduct, and that she was a happily married woman, Hughes: (1) stroked her palm with his fingers in a sexually suggestive manner approximately twice a month; (2) said inappropriate things to her once or twice a week, and would "talk filthy stuff all the time"; (3) put his arm around her shoulder approximately twice a week; (4) grabbed his private parts on more than one occasion; (5) several times pretended that he wanted to whisper something to her and then blew in her ear; (6) told Plaintiff that he would like to see where her bikini lines were; (7) told Plaintiff that he had seen her laying out in her yard; (8) told Plaintiff that he liked to watch his wife have her physical performed by her doctor; (9) told Plaintiff that he saw Plaintiff and her husband in their truck and Plaintiff's blond head was bobbing up and down as if she were performing oral sex; (10) told Plaintiff that he had pictures of her in her bathing suit; (11) told Plaintiff that she shouldn't hang her coat up over his because the smell of her perfume aroused him; (12) on or about October 29, 2002, stated that his wife had said that if he got home by 3:15 she would give him "a piece of ass." He then grabbed his private parts and stated, "I have half a hard on now so I better go."

Plaintiff submits that the above facts and the frequency of the conduct as described by Plaintiff at least raise an issue of fact to be determined by a jury as to whether the conduct and all the circumstances was sufficiently pervasive.

In addition, Plaintiff's emotional and physical response to Defendant's telling her that she had to continue working with Hughes after Plaintiff had informed Defendant of this conduct certainly amounted to a detrimental effect. She began hyperventilating, collapsed, and had to be taken by ambulance to the emergency room.

### B. Respondeat superior liability

As discussed in detail in the Facts portion of this Brief, there are disputed issues as to whether Defendant knew of Hughes' conduct and prior rape convictions prior to Plaintiff's October 29, 2002 report. Plaintiff submits that Defendant did not take reasonably appropriate steps to remedy the situation when, despite all the information Plaintiff reported, Defendant attempted to require Plaintiff to continue working with Hughes. Plaintiff explained her fear of Hughes, that she could find herself alone with him, especially at night. Plaintiff suggested having her report to a different supervisor. Despite all of this, Defendant continued to insist that Plaintiff had to continue working with her harasser. It wasn't until Plaintiff actually hyperventilated, collapsed, and was taken by ambulance to the emergency room that Defendant finally took action to preclude Plaintiff's having to work with Hughes, i.e. requesting Hughes' resignation. Plaintiff therefore submits that

Defendant did not act reasonably under the circumstances in trying to force Plaintiff to continue working with her harasser.

At the least, Plaintiff submits that under all of the circumstances and disputed material facts, this is an issue that should be decided by the jury.

For all of the above reasons, Plaintiff respectfully requests that Defendant's Motion for Summary Judgment be denied and this case permitted to proceed to the jury.

                                                RIEDERS, TRAVIS, HUMPHREY, HARRIS,
                                                     WATERS & WAFFENSCHMIDT

                                            S/ Jeffrey C. Dohrmann, Esquire
                                            _____
                                            Jeffrey C. Dohrmann, Esquire
                                            Attorney for Plaintiff
                                            161 West Third Street, PO Box 215
                                            Williamsport, PA 17701
                                            PA Bar No. 68870
                                            Tel: (570) 323-8711
                                            Fax: (570) 323-4192
                                            E-Mail: jdohrmann@riederstravis.com

## **CERTIFICATE OF SERVICE**

AND NOW comes Jeffrey C. Dohrmann, Esquire, Attorney for Plaintiff, and certifies that the foregoing Brief has been served on David J. MacMain, Esquire, 123 S. Broad Street, Philadelphia, PA 19109, this 11th day of October, 2005, by ECF and, if necessary, by first class mail postage prepaid.

RIEDERS, TRAVIS, HUMPHREY, HARRIS, WATERS & WAFFENSCHMIDT

S/ Jeffrey C. Dohrmann, Esquire

_____
Jeffrey C. Dohrmann, Esquire
Attorney for Plaintiff
161 West Third Street, PO Box 215
Williamsport, PA 17701
PA Bar No. 68870
Tel: (570) 323-8711
Fax: (570) 323-4192
E-Mail: jdohrmann@riederstravis.com